IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| ASKIA K. MUHAMMAD,<br><br>           Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>           Defendant. | CASE NO. 1:25-cv-2505<br><br>DISTRICT JUDGE<br>DONALD C. NUGENT<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Askia Muhammad filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In October 2022, Muhammad filed an application for supplemental security income, alleging a disability onset date of September 14, 2008.[1] Tr. 17, 199. In his application, Muhammad claimed that he was disabled due to post-

---

[1]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

traumatic stress disorder (PTSD), "metal in back," and thoracic pain. Tr. 242. The Social Security Administration denied Muhammad's application and his motion for reconsideration. Tr. 70, 80. Muhammad then requested a hearing before an Administrative Law Judge (ALJ). Tr. 120.

In December 2024, an ALJ held a hearing, during which Muhammad and a vocational expert testified. Tr. 40–59. The next month, the ALJ issued a written decision finding that Muhammad was not disabled. Tr. 17–35. The ALJ's decision became final on September 22, 2025, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Muhammad filed this action on November 18, 2025. Doc. 1. He asserts the following assignment of error:

> Did the ALJ fail to properly reconcile mental limitations found generally persuasive, warranting remand?

Doc. 9, at 1.[2]

**Evidence**

*Personal and vocational evidence*

Muhammad was 34 years old on the date he filed his application. Tr. 34. He completed the twelfth grade and obtained a GED. Tr. 46, 243. He has no past relevant work. Tr. 44.

---

[2]    In this report and recommendation, all of the citations to the parties' briefs refer to the ECF document and page number shown at the top of the page.

2

*Relevant medical evidence*

The ALJ summarized the medical evidence as follows:[3]

> The objective medical evidence also documents the claimant's treatment for anxiety, bipolar, and posttraumatic stress disorders (*see e.g.*, Exs. C1F/65, 74; C8F/19-20, 44;C9F/5, 14, 34-35, 38; C10F/1, 58). Additionally, the record shows the claimant smoked marijuana (Exs. C1F/77; C8F/7-8, 12; C9F/36), and has a history of cocaine use (*see e.g.*, Exs. C1F/77; C8F/8), which he has treated with Suboxone therapy since September 2022 (*see e.g.*, Exs. C5F/2; C8F/12; C10F/1). The claimant has endorsed depression, suicidal ideation with a plan, sadness, self-isolation, sleep difficulty/insomnia, (*see e.g.*, Exs. C4F/3; C5F/2, 6; C8F/11-12, 39, 43, 56, 69, 71, 73, 86, 92; C9F/15-17, 36; C10F/23). He has also related anxiety and worry about family trying to kill him (Ex. C8F/13). He has also presented as disheveled with an anxious attitude, irritable, anxious and depressed mood, flat affect, and mental status examinations have found poor frustration tolerance, hyperverbal communication, circumstantial/tangential, distractable, preoccupied, flight of ideas, and symptoms similar to paranoid personality disorder (*see e.g.*, Exs. C8F/15-16, 22, 90).
>
> The claimant sought treatment in the emergency department for mania, homicidal thoughts, suicidal and homicidal thoughts, anxiety, interpersonal conflict, and substance abuse shortly before October 24, 2022, on September 1, 2022. While he initially presented as agitated, preoccupied, irritable, loud, tangential and difficult to redirect, and his judgment was poor, he deescalated towards the end of his initial assessment. While he also claimed he was going to take himself out and someone was going with him if no one could help his case, give him immediate help, or financial assistance, he subsequently noted he had been frustrated with his

---

[3]    Muhammad doesn't challenge the ALJ's recitation of the evidence.

situation and had no plan or intent to harm anyone. Additionally, urine drug screening was positive for cocaine and marijuana. He was held to allow the drugs in his system to metabolize and see if his symptoms were substance induced. Mental status examination the following day found the claimant calm, and cooperative and he was able to hold a conversation without going off on tangents. He denied wanting to harm anyone else and endorsed interest in substance abuse counseling. He also requested assistance with financial assistance and gaining disability. The claimant also expressed the ability to keep himself safe and feel safe in the community and subsequently discharged on September 2, 2022 (Ex. C1F). Moreover, he sought treatment in the crisis stabilization unit (CSU) and placed in individual outpatient psychotherapy to obtain stability on his medication and on track with his mental health in January 2023. He also noted he was looking to get Social Security so he did not have to work and that his mental health was severe enough where he did not think he could work (Ex. C8F/1, 4).

While the claimant reported a history of anxiety, bipolar disorder, learning problems since childhood, and difficulty getting along with others at his April 18, 2023 psychological consultative examination, he noted he was not working because of his physical health problems. Although he described his mood as feeling little and neglected since about age 13, he noted he felt okay about himself. While he noted difficulty with sleep for the last three years and feeling rushed because of anxiety, he denied crying episodes, mania/hypomania, changes in energy, anhedonia, delusions, and hallucinations. While he was somewhat overly dramatic and vague when describing various issues and situations, his eye contact was appropriate, he was calm and stable, and he did not exhibit any unusual gestures, mannerisms, or motor activity. He was dressed appropriately with unremarkable hygiene. Moreover, he was oriented to person, place, and time, his speech was fluent, and his comprehension

was intact at his physical consultative examination. Moreover, his speech was coherent with unmarkable speed and rhythm, his thought processes were logical, and he did not need directions or words explained or defined, and he did not need simple or multi-step directions or questions repeated. While his recall of recent and past experiences was unremarkable, he recalled only three digits forward and backward, his performance on serial 7's was limited, and his delayed recall was zero out of three items after a five minute delay (Ex. C2F/8).

***

With respect to treatment, in addition to individual counseling, the claimant has been prescribed and taken appropriate medications for his mental impairments, including Abilify, Clonazepam, Cymbalta, Sertraline, Paxil, Vistaril, Xanax, Zoloft, and Zyprexa (*see generally* Exs. C4F/3; C5F/2; C8F/11, 14; C9F/15-17, 36; C10F/1, 56-57). While this tends to weigh in the claimant's favor, the medical evidence reveals that his medications have been relatively effective in controlling his symptoms, as he has presented as cooperative, with average eye contact, full affect, clear speech, logical thought processes, average intelligence, normal cognition, thought content, judgment, and perceptions (Ex. C8F/16-18). He has also frequently denied psychological symptoms or concerns including crying episodes, anhedonia, mania/hypomania, delusions, and hallucinations (*see e.g.*, Exs. C4F/3; C8F/100, 106, 110, 124, 127, 151; C10F/2, 12, 17, 23, 28, 33, 38, 48, 53) and treatment providers have failed to appreciate any psychological abnormalities on several occasions (*see generally* Exs. C5F; C8F; C9F; C10F). For instance, the claimant reported his medications were helpful at his April 18, 2023 psychological consultative examination (Ex. C4F/3). In fact, the claimant frequently denied any psychiatric symptoms during the period December 8, 2022 through October 19, 2023 (Ex. C5F/3-41). Moreover, examinations were unremarkable on many occasions during this period, as he presented as alert and oriented, with appropriate or normal

mood and affect, coherent thought process, good thought flow, intact recent and remote memory, and good insight and judgment. Moreover, treatment providers have noted his progress and decreased mental health symptoms on several occasions (*see generally* Exs. C5F, C8F). For example, February 16, 2023 progress notes from Catalyst Life Services show the claimant demonstrated increased mood and motivation with completing a scheduled task and denied any concerns related to his history symptoms (Ex. C8F/69). He noted decreased suicidal ideation on February 24, 2023 (Ex. C8F/72). While he reported increased anxiousness regarding utility assistance, he denied symptoms of depression on February 28, 2023 (Ex. C8F/75). The claimant reported appropriate mood and denied mental health concerns again on March 20, 2023. Moreover, he demonstrated increased mood and motivation with completing a task, and denied any mental health symptoms on March 21, 2023. While his therapist noted his mental health had improved, he required continued support to decrease risk of relapse (Ex. C8F/80, 84-85). While he expressed increased distress regarding peer pressure he was experiencing and he needed verbal prompts to complete a scheduled task on April 18, 2023, he continued to deny any concerns related to his mental health (Ex. C8F/88). While he reported being started on Ativan for anxiousness on April 18, 2023, … his affect was flat, his mood was appropriate. His therapist noted his mental health remained improved, he still required support due to ongoing stressors and lack of support (Ex. C8F/90). While his mood was appropriate and he continued to deny any mental health related concerns on July 26, 2023, he presented with a flat affect and acknowledged increased in isolating tendencies and lack of social support from either peers or family. He also agreed to referral to a mental health specialist to increase support and mental health stability (Ex. C8F/97). While the claimant related concerns with chronic pain and depression on October 2, 2023, his therapist noted he was making some progress as he reported a decrease in his depression (Ex. C8F/102-

103). The claimant denied any psychological symptoms on October 26, 2023. He presented as alert and oriented with normal mood and affect, intact recent and remote memory, and good insight and judgment. Moreover, his counselor again noted ongoing progress and decreased mental health symptoms (Exs. C8F/105; C10F/1, 3). He subsequently denied any psychological symptoms on December 1, 2023 and December 15, 2023 (Ex. C10F/12, 17).

The claimant's mood and affect were appropriate and he continued to deny any mental health related concerns on January 12, 2024. While his therapist noted he continued to make progress and reported a decrease in his mental health symptoms, she indicated he continued to need support due to poor coping skills and somatic stressors (Ex. C8F/106). The claimant reported he was recently prescribed Xanax for his anxiety on January 16, 2024. His mood and affect were appropriate throughout the visit (Ex. C8F/108). The claimant's therapist observed a decrease in his depressive symptoms on May 9, 2024 (Ex. C8F/121). While his therapist offered to assist him with getting documents for his disability claim on May 13, 2024, the claimant declined because he was currently working to earn some extra money and unable to go that day (Ex. C8F/127). The claimant reported he was receiving ineffective mental health treatment from his primary care physician on June 10, 2024. While he endorsed ongoing somatic stressors related to his job related left hand injury and back pain, he denied concerns related to his mental health. His mood and affect were appropriate (Ex. C8F/133). He verbalized appropriate mood and denied any concerns regarding his mental health on October 22, 2024 (Ex. C8F/164-165). The claimant related he was doing good and denied any psychological symptoms on February 11, 2024 (Ex. C10F/33). Moreover, the

7

> claimant continued to deny an[y] psychological symptoms on November 6, 2024 (Ex. C10F/58).

Tr. 28–31 (footnote omitted).

*Consultative examiner*

In April 2023, Muhammad saw Sudhir Dubey, Psy. D., for a consultative exam. Tr. 388. Muhammad reported a history of anxiety and bipolar disorder, learning problems since childhood, and difficulty getting along with others. Tr. 388. He said that medication helped. Tr. 389. Muhammad stated that his problems with working were due to physical problems. Tr. 390. He explained that he could always meet basic job expectations and requirements and that he had "minimal" relationships with coworkers and supervisors because he kept to himself. Tr. 390. Dr. Dubey commented that Muhammad was "somewhat overly dramatic and vague when describing various issues and situations." Tr. 390. He observed that Muhammad had unremarkable speech and thought process. Tr. 391. Cognitive testing put Muhammad in the low-average range. Tr. 391. Dr. Dubey diagnosed depressive disorder and mild alcohol use disorder. Tr. 392. He opined that Muhammad could understand, remember, and carry out simple and multi-step instructions. Tr. 393. Muhammad could maintain attention, concentration, and pace to remember and carry out simple tasks and multi-step tasks. Tr. 393. He "would not have

any significant issues" with supervisors and coworkers, and he "may have some difficulties dealing with work pressure." Tr. 393–94.

*State agency opinions*[4]

In June 2023, Aroon Suansilppongse, M.D., reviewed Muhammad's record. Tr. 64–67. Regarding Muhammad's residual functional capacity (RFC),[5] Dr. Suansilppongse found that Muhammad could understand and remember simple instructions and perform work with "low production demands/work quotas." Tr. 66. He could have superficial and infrequent contact with supervisors, coworkers, and the general public. Tr. 66. Muhammad could perform work "with few changes which are easily explained ahead of time, and where support is available in times of change." Tr. 67.

In November 2024, Irma Johnson, Psy.D., reviewed the record and agreed with Dr. Suansilppongse's findings. Tr. 76–78.

---

[4]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[5]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

9

*Hearing testimony*

Muhammad, who was represented by counsel, and a vocational expert testified at the telephonic administrative hearing held in December 2024. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Muhammad could perform work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 54–55. The vocational expert answered that such an individual could perform the following jobs: housekeeping cleaner, electronics worker, and produce sorter. Tr. 55–56.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant has not engaged in substantial gainful activity since October 24, 2022, the application date (20 CFR 416.971 *et seq.*).
>
> 2. The claimant has the following severe impairments: degenerative disc disease, gunshot wound with fragments remaining in the bilateral shoulders and thoracic spine, right rotator cuff tear, obesity, anxiety, depression, and posttraumatic stress disorder (20 CFR 416.920(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he cannot climb ladders, ropes, or scaffolds; he can frequently climb

ramps and stairs, stoop, kneel, crouch and crawl; he can occasionally reach overhead and frequently handle and finger with the right upper extremity. Mentally, he can understand remember and carryout simple instructions, but he cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas. Moreover, he can occasionally interact with the public, coworkers and supervisors; all communication is limited to the straightforward exchange of information without negotiation, persuasion or conflict resolution; and he can deal with occasional changes in a routine work setting.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was … 34 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since October 24, 2022, the date the application was filed (20 CFR 416.920(g)).

Tr. 21–35.

11

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work

> experience? If so, the claimant is not disabled.
> If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by

13

substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Muhammad argues that the ALJ intended to adopt the state agency psychiatric reviewers' opinions, but "reframed the[se] limitations" in the RFC in a way, Muhammad alleges, that didn't reflect the reviewers' opinions. Doc. 9, at 6–8.

As an initial matter, it is necessary to identify the state agency reviewers' opinions. In the Mental Residual Functional Capacity form, the reviewers are asked to "[e]xplain in narrative form" the limitations found in each of the four areas of functioning. Tr. 65. Dr. Suansilpppongse did so, and then he added his "notes," which detailed the reasons for his assessed

14

limitations.[6] Tr. 66–67. For instance, the form shows the following prompts and Dr. Suansilppongse's response:

> *Explain in narrative form the sustained concentration and persistence capacities and/or limitations.*
>
> Can do work with low production demands/work quotas.
>
> MC's [Dr. Suansilppongse's] notes
>
> The claimant is able to carry out simple instructions. His anxiety and depressive reaction as well as alleged pain would occasionally interfere with his ability for sustained concentration, persistence or for task completion. However, the claimant would be able to complete tasks at an acceptable pace.

Tr. 66. It is clear that the first sentence is Dr. Suansilppongse's opinion about Muhammad's ability to sustain concentration and persist, and the "notes" are Dr. Suansilppongse's supporting explanation. *See also* 20 C.F.R. § 404.1513(a)(2) (defining a "medical opinion" as "a statement from a medical source about what [claimants] can still do despite [their] impairment(s)").

Muhammad argues that the *notes* represent the narrative portion of Dr. Suansilppongse's opinion. Doc. 9, at 9. But this is not so—the *notes* are just that—an explanation for Dr. Suansilppongse's finding that Muhammad can

---

[6] Dr. Johnston adopted everything that Dr. Suansilppongse wrote. Tr. 76–77.

perform work with low production demands and quotas.[7] Muhammad complains that Dr. Suansilppongse's *notes* are inconsistent with his assessed limitation. Doc. 9, at 10. But this is not so, either. Dr. Suansilppongse observed that Muhammad's symptoms would occasionally interfere with his ability to concentrate and persist, and, as a result, limited Muhammad to low production work with no quotas. Even if it could be said that Dr. Suansilppongse's *notes* are inconsistent with his assessed limitation, which they are not, Muhammad hasn't shown how any alleged inconsistency in Dr. Suansilppongse's opinion is the ALJ's fault.

Moving on, the ALJ considered the state agency reviewers' opinions and found that while they were "generally consistent with the medical evidence of record, the limitations assessed [we]re not set forth in complete vocationally relevant terms." Tr. 32. The ALJ explained:

> Thus, based on the evidence, which shows no more than moderate mental limitations, the undersigned has reframed the claimant's functional capacity above in order to use vocationally relevant terminology that the reviewing psychological consultants did not use in their opinions, noting that such limitations are consistent with the overall record, including the observations and report of the consulting physician (Ex. C2F) and the consulting psychologist, as discussed below (Ex. C4F).

Tr. 32.

---

[7] Even if the notes could be considered part of the state agency reviewers' opinions, the ALJ's RFC is not inconsistent with either the assessed limitations or the notes, as explained below.

16

The Commissioner provides the following chart illustrating the difference, if any, between the ALJ's RFC and the state agency opinions:

| The ALJ found Plaintiff could | The state agency psychologists found Plaintiff could |
|---|---|
| • understand, remember, and carryout simple instructions | • understand and remember simple instructions |
| • not perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas | • do work with low production demands/work quotas |
| • occasionally interact with the public, supervisors, and coworkers so long as communication was limited to straightforward exchanges of information without negotiation, persuasion, or conflict resolution | • do work that involves only superficial and infrequent contact with coworkers, supervisors, and the general public |
| • he could deal with occasional changes in a routine work setting | • and do work with few changes which are easily explained ahead of time and where support is available in times of change |

Doc. 10, at 7 (citing Tr. 25, 66–67, 76–77). The Commissioner asserts that an ALJ's reframing of limitations into vocationally relevant terms is not improper and submits that the limitations in the ALJ's RFC "captured" the state agency reviewers' assessed limitations. *Id*.

Muhammad argues that the RFC "deviate[d] … in material ways" from the state agency reviewers' opinions. Doc. 9, at 8. He complains that the ALJ omitted the word "superficial" from the state agency reviewers' interacting-with-others limitation and improperly replaced it with a limitation that Muhammad can have "straightforward exchanges of information without negotiation, persuasion, or conflict resolution." *Id*. at 10. But Muhammad hasn't explained why he believes that the ALJ's version fails to adequately

17

describe *superficial* contact. He hasn't provided a definition of *superficial* or cited case law rejecting an ALJ's rephrasing of this term in an RFC.

The Sixth Circuit has found that an ALJ may further define the term *superficial* when adopting such a limitation from a state agency reviewer's opinion. In *Mabry-Schlicher v. Comm'r of Soc. Sec.*, the Court found that an ALJ did not err when he determined that a *superficial* limitation was "vocationally vague" and defined the term in the RFC as "the ability to receive simple instructions, ask simple questions, and receive performance appraisals" but not "more complex social interactions such as persuading other people or rendering advice." No. 24-3811, 2025 WL 1604376, at *4–5 (6th Cir. June 6, 2025). In support of its finding, the Court cited the following reasons: an ALJ isn't required to adopt an opinion wholesale[8]; the state agency reviewers "never elaborated on the meaning of the term in their opinions"; and the "applicable regulations and guidance … lack any specific definition or list of criteria regarding 'superficial' workplace interaction."[9] *Id.* at *5; *see also Lopez v. Comm'r of Soc. Sec.*, No. 1:22-cv-01801, 2024 WL 1580101, at *19 (N.D. Ohio

---

[8]     "Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

[9]     "The term 'superficial interaction' is not defined under the Dictionary of Occupational Titles … or Selected Characteristics of Occupations.…" *Betz v. Comm'r of Soc. Sec.*, No. 3:21-cv-2408, 2022 WL 17717496, at *10 (N.D. Ohio Nov. 8, 2022), *report and recommendation adopted*, 2022 WL 17985680 (N.D. Ohio Dec. 29, 2022).

Apr. 11, 2024) (finding that the ALJ did not err when defining "superficial interaction" as "work that does not involve any work tasks, such as arbitration, negotiation, confrontation, being responsible for the safety of others, or directing the work of others."); *Schneiderman v. Comm'r of Soc. Sec.*, No. 1:22-cv-1745, 2023 WL 4710874, at *11 (N.D. Ohio June 22, 2023) (finding that the ALJ did not err when he rephrased the state agency reviewer's "superficial" limitation to the "vocationally relevant definition" of no "negotiating, instructing, persuading, or directing the work of others"), *report and recommendation adopted*, 2023 WL 4706812 (N.D. Ohio July 24, 2023); *Betz*, 2022 WL 17717496, at *11–12 (N.D. Ohio Nov. 8, 2022) (rejecting the claimant's argument that the ALJ erred when defining "superficial contact" as "no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety or welfare of others") (discussing cases). Muhammad has not shown that the ALJ erred when she defined the term *superficial* in the RFC.

Next, Muhammad argues that the RFC's occasional-changes-in-a-routine-work-setting limitation means something different than the state agency reviewers' limitation that Muhammad can have "few changes which are easily explained ahead of time, and where support is available in times of change." Doc. 9, at 11–12. "Occasional" is synonymous with "few." *See, e.g.,* Soc. Sec. Ruling 83-10, 1983 WL 31251, at *5 ("'Occasionally' means occurring from very little up to one-third of the time."). As for changes "easily explained ahead

19

of time," Tr. 32, Muhammad hasn't shown that this restriction isn't covered by the ALJ's additional RFC findings that Muhammad is limited to a "routine work setting" that involves only "simple instructions," is not fast-paced, and is limited to the "straightforward exchange of information," Tr. 25.[10]

Finally, regarding "support … available in times of change," the ALJ wrote that her RFC assessment, which omitted this provision, was "consistent with the overall record, including the observations and report of … [Dr. Dubey], as discussed below." Tr. 32. Directly below this statement, the ALJ recounted Dr. Dubey's findings, which she found persuasive, including that Muhammad could perform simple and even "multi-step instructions … and multi-step tasks independently on his own." Tr. 32–33, 393. This is a sufficient explanation for the ALJ's rejection of a limitation that Muhammad would need "support … available in times of change." Tr. 32. Indeed, Muhammad himself reported that

---

[10] Muhammad hasn't cited legal authority in support of his argument. Some courts in the Southern District of Ohio have found that an ALJ's non-adoption of a changes-in-advance limitation without explanation was reversible error. *See, e.g., Leonard F. v. Comm'r of Soc. Sec.*, No. 2:22-CV-4183, 2024 WL 1254354, at *3–4 (S.D. Ohio Mar. 25, 2024) (finding the ALJ erred by not adopting or explaining the omission of a changes-explained-in-advance limitation when the ALJ "did not acknowledge [the] opinion at all"; did not "expressly adopt or reject it"; "nothing in the record suggests that the identified jobs would preclude such unannounced, immediate, major changes"; "nothing in the ALJ's decision suggests that the ALJ implicitly considered and rejected the opinion based on the evidence"; and the ALJ "seems to have intended his adaptive limitations to be *more* restrictive than those opined" by the state agency reviewer but the RFC was not more restrictive). Arguably none, or almost none, of the above-stated reasons in *Leonard F.* are present here and Muhammad hasn't attempted to persuade this Court to follow the reasoning in *Leonard F.*

he "was always able to meet … basic job expectations and requirements" and he had "no history of problems in the work environment with performance." Tr. 390, 393.

All told, Muhammad hasn't shown that the ALJ erred when assessing the RFC.

### Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: June 17, 2026

 /s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).